IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 0 6 2007

Stephan Harris, Clerk
Cheyenne

KORANA L. DEDIC,

    Plaintiff,

    vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

    Defendant.

Case No. 06-CV-175

---

**OPINION AND ORDER AFFIRMING FINAL DECISION OF COMMISSIONER
AND DENYING PLAINTIFF'S MOTION TO SUPPLEMENT THE RECORD**

---

    This is a civil action brought by Korana L. Dedic under 42 U.S.C. § 405(g) to obtain

judicial review of the decision of Administrative Law Judge Larry Donovan issued January

20, 2006, denying Dedic's claim for disability insurance benefits under Title II of the Social

Security Act. The Court, having heard oral argument, having considered the filings and the

administrative record, the applicable law, and being fully advised in the premises, **FINDS**

and **ORDERS** as follows:

### Procedural Background

    Dedic filed an application for disability benefits on January 28, 2004, alleging an

onset date of September 5, 2003. Her application was denied initially and upon

1

reconsideration. An administrative hearing was held on November 18, 2005, and the Administrative Law Judge (hereinafter "ALJ") issued his decision denying her application for benefits on January 20, 2006.

The ALJ made these findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's history of a lumber fusion, and back, hip and leg pain are considered 'severe' impairments, based upon the requirements in the Regulations. (20 C.F.R. § 404.1520(c)).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant retains a residual functional capacity for a light exertional level, who requires an ability to alternate between sitting and standing/walking to relieve discomfort, who can occasionally climb stairs but should not climb ladders, ropes or scaffolds, who can occasionally balance, stoop, kneel and reach above shoulder level bilaterally, who should not be subject to exposure to extreme cold and who should have be [sic] subject to any hazards of the workplace.

7.  The claimant's past relevant work as an administrative clerk and as a medical secretary did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. § 404.1565).

8.  The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

9.    The claimant was not under a 'disability,' as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. § 404.1520(f)).

The Appeals Council denied her request for review in May 2006, making the ALJ's

decision final. Mrs. Dedic's administrative claims have been exhausted, making her present

Complaint ripe for judicial review. On July 10, 2006, Dedic filed a Complaint and Petition

for Judicial Review in this Court. The parties do not dispute jurisdiction. Dedic prays for the

following relief:

1.    That the decision of the Defendant be reviewed and set aside with an Order that the Plaintiff's claim for disability insurance benefits be allowed requiring that the Defendant be ordered to pay such benefits; or, in the alternative,

2.    That the Court remand this case to the Defendant for a fair hearing; and

3.    That the Court award the Plaintiff costs and reasonable attorney's fees; and

4.    That the Court grant such other and further relief as is appropriate in the circumstances.

Dedic submits the following questions for judicial review:

1.    Whether substantial evidence supports the Commissioner's final decision that plaintiff was not "disabled,"as defined by the Social Security Act.

    a.    Whether the Commissioner erred in failing to properly assess whether plaintiff meets or equals a listed impairment.

    b.    Whether the Commissioner erred in assessing a residual functioning capacity, most particularly by rejecting opinions of treating physicians.

    c.    Whether the Commissioner erred in finding plaintiff's allegations less than credible.

3

## Factual Background & Medical Evidence

Dedic was born on February 18, 1968. (Tr. 56). She completed two years of college, and in the past has worked as a merchandiser, medical secretary, office manager, and cashier. (Tr. 90, 95). In 1996, she was involved in a motor vehicle accident, where her initial injury occurred. (Tr. 208). In 2001 she underwent back surgery, consisting of a 2-level fusion at L4-L5 and L5-S1 secondary to herniated discs and to chronic pain. (Tr. 208). Dedic alleges that she became disabled on September 5, 2003 due to pain in her back, leg, knee, neck, arm, and head.[1]

Dedic last worked full time in 1996. Over the years, as the pain increased, her work hours decreased. She cut her work hours down to 15 hours per week, and then eventually stopped work altogether. At the time of her hearing with the ALJ, she had not worked for approximately one year. Dedic tried several different jobs in an attempt to find one that was bearable, but she claims that the work was unbearable for even short periods of time due to her pain.

Dedic lives in a two-story house in Casper with her family, including her mother (for whom she is caregiver), her husband (who works long hours and is gone overnight several times per week), her four children (including a toddler), and two dogs. She currently spends her days doing light housework, including preparing simple meals, driving the children to school, caring for her youngest child, mother, and family pets, paying bills, and doing

---

[1] Notably, her third child was born on September 27, 2003.

laundry, vacuuming and dusting if she feels up to it. She and her husband also keep a garden. She alleges difficulty with several of these tasks, and requires help for some of them, including unloading the dishwasher, grocery shopping, and doing laundry.

In November 2002, Dedic had a thoracolumber myelogram. The myelogram revealed no spinal stenosis or truncation of the lumber nerve roots. It also found narrowing of the L5-S1 disc space. (Tr. 178). A lumber CT scan done the same day showed post-surgical changes and showed no stenosis, disc herniation or nerve root clumping to suggest arachnoiditis. (Tr. 179). It showed mild facet arthritis and mild ligamentum flavum hypertrophy at L3-L4.

An examination in April 2003 by a PA at Dr. Narotzky's office noted that during the six months prior to the examination, Dedic had been experiencing right leg pain and was now experiencing similar pain in her left leg. At that point she was 16 weeks pregnant. Examination showed antalgic, nonataxic gait, good strength in lower extremities, and back and leg pain with a straight leg raise. He reviewed her myelogram and CT scan, and explained, "to my eye, she only has minor changes at the level above her fusion. I do not think this adequately explains her level of pain." (Tr. 199-200).

An examination by Dr. Narotzky in May 2003 noted that "she has been having increasing difficulty with low back pain and bilateral leg pain." It also noted that she was 20 weeks pregnant at the time. Examination showed normal gait, normal strength in the lower extremities, normal reflexes, and negative straight leg raise. Movements of the hip caused mild back discomfort on the right side. (Tr. 197-198).

5

On November 26, 2003, the PA reported: "She continues to have low back pain with radiation into her right lower extremity in a nondermatomal distribution, which is quite severe. She has had myelography last year, which revealed only minor changes at level above her fusion. She had a L3-4 facet block as well . . ." Examination found normal strength and sensation in lower extremities, normal reflexes, and an antalgic and nonataxic gait. (Tr. 195).

In March 2004, Tim Frary, PAC, saw Dedic for a physical examination. Dedic complained of chronic pain in her back, hip, leg, knee, and neck, as well as headaches. She estimated that she could sit for 15 to 30 minutes at a time, stand for 30 to 45 minutes, and walk one to two blocks without stopping. The examination showed tenderness and limitation of motion of Dedic's neck, complaints of "tingling hypesthesia" in a left finger, slight weakness (rated 4/5) of the left hand, normal deep tendon reflexes at the knee and ankle, positive straight leg raising test on the right, and tenderness to palpation around the donor site. He found that Dedic exhibited a "relatively normal, but slightly slowed gait." (Tr. 209-10).

In April 2004, Dr. Kline completed a Residual Functional Capacity Assessment for the Commissioner. He noted a primary diagnosis of "fusion–herniated discs, L4-5, L5-S1," and a secondary diagnosis of headaches. He found that she could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, and could stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday. He opined that she could sit about 6 hours in an 8-hour workday, and that she had unlimited pushing and pulling ability. Dr.

6

Kline found that she could climb, balance, kneel, crouch and crawl occasionally. He supported his determinations with specific findings and noted that, "Claimant is considered partially credible as some pain is reasonable given her fusion. Extremity exam of 3/04 is not significant for UE LE joint disorders." (Tr. 157-163).

In August 2004, Dr. Studer examined Dedic for her complaints of neck and upper back and lower back pain. She complained of her fatigue, and explained that she has to get up several times during the night for either her baby or with back pain. She also complained of shakiness and vision problems. Dr. Studer found that her neck was tender to palpation and that she had a limited range of motion in her c-spine due to pain. He found she was tender over her upper thoracic back muscles and over the SI joint. Knee extension while seated was painful with pain radiating into the buttock. (Tr. 213).

In August 2004, Dr. Kanard completed a Residual Functional Capacity Assessment. His findings matched those given by Dr. Kline. While he was directed by the form to cite the specific facts on which he based his conclusions, Dr. Kanard simply wrote "See RFC dated 4/5/04." (Tr. 165-173).

Also in August 2004, Dedic underwent evaluation at Wind City Physical Therapy. The physical therapist noted that her low back pain "puts her in the crippled range." The therapist wrote that Dedic has low back pain, bilateral radicular symptoms and aching, and that the symptoms are worse with sitting, standing, walking. The therapist also found that her neck was "in the complete range for disability." Arm and neck pain increased with sitting,

7

sleeping, paper work, stocking items, or driving. The examination also revealed moderate flexion loss and major extension loss in the lumbar spine, and minimal loss of all motions except for side bending and rotation bilaterally, which had mild to moderate loss in the cervical spine. Test movements for the lumbar and cervical spine increased pain in some instances. (Tr. 234-235).

In October 2004, Dedic again saw Dr. Narotzky, this time with complaints of increased lower back pain that was radiating into both legs, and numbness and tingling in the right leg. At that point Dedic rated her pain at a 10 in the right leg and an 8 on the left. Examination showed normal gait, normal strength in the lower extremities, normal reflexes, and a negative straight leg raise. The doctor ordered a myelogram and a CT scan which were later cancelled by Dedic because of lack of funds. (Tr. 220-221).

In December 2004, Dedic again went to physical therapy, although the center had discharged her because they had not seen her since September. Dedic reported that a majority of her pain was in the cervical thoracic region, and explained that she might have over done it one day at the gym. Upon reexamination, the therapist found that Dedic had a great deal of palpable muscle spasms, and found major extension loss and moderate flexion loss in her cervical ROM. (Tr. 236). Dedic was going to try to work with her insurance so that she could attend therapy. There are no physical therapy records indicating that she returned for treatment. (Tr. 236-237).

In May 2005 she again saw Dr. Studer with complaints of increased low back pain

8

radiating to her right foot which increased with standing or walking. She also complained of bilateral hand pain. Examination showed slight tenderness upon palpation over the paraspinus muscles and tenderness over the right SI joint and sciatic notch. She had positive straight leg raising and negative contralateral leg raising. He also found a positive Phalen's sign. (Tr. 211).

A myelogram was completed in May 2005. It showed "marked facet hypertrophy" in the lumber spine, which caused "mild thecal sac compression." Mild anterior epidural scarring was found at the L4-L5 level. At the L5-S1 level, the study found no disc bulge, herniation or lateral recess compromise by hardware. The myelogram found "mild clumping of nerve roots suggesting mild arachnoiditis." It also found a C6-C7 disc herniation which caused cord compression. No thoracic disc herniations were found. (Tr. 229-231).

In June 2005, Dedic again saw Dr. Narotzky who reported normal gait and normal strength in Dedic's lower extremities. He also found normal reflexes and a negative straight leg raise. Internal rotation of the hips reproduced some of her pain. Dr. Narotzky stated that, "her previous myelogram and x-rays have not shown any specific correctable cause for her ongoing pain." He then suggested a spinal cord stimulator. (Tr. 226). He later reported that her follow-up pelvis x-ray "looks okay." (Tr. 227).

In November 2005, Dedic saw Dr. Studer for an assessment. Dr. Studer found that Dedic was limited to occasionally lifting or carrying twenty pounds. He also found that she was limited to four hours of sitting per eight hour work day, and one hours of both standing

9

and walking. Dedic was required to alternate sitting and standing every 30 minutes. Dedic could occasionally climb stairs, stoop, crouch, kneel, crawl, and balance.

Studer appended progress notes to his assessment, but did not specifically support any portion of his assessment with any specific findings. His progress notes are from May 2005, and November 2005. The notes from November show that Dedic reported pain with everyday activities and constant pain in her upper extremities and neck. He rated her lower extremity pain at an 8. She reported swollen feet and that her shoes were uncomfortable, yet on evaluation Dr. Studer noted that her feet appeared to be normal. Dr. Studer found decreased extension, flexion and rotation of the cervical spine, tenderness on palpation of the cervical muscles, decreased lumbar range of motion, tenderness at various spinal points, and decreased sensation in the right leg. He thought Dedic had "chronic generalized pain, consistent with fibromyalgia." (Tr. 243).

Later that month, Dr. Zondag completed an assessment. He found that Dedic was unable to lift or carry any weight, but that she could sometimes lift five to eight pounds. He found that Dedic could sit and stand for 30 minutes each before changing positions and was limited to sitting two hours, standing one hour, and walking one hour, total, during an eight-hour day. He found that she could occasionally reach, push/pull, operate foot controls, climb stairs, balance, stoop, kneel, and crawl. His conclusions were supported with citations to the 2005 myelogram. (Tr. 244-247).

**The Plaintiff's Motion to Supplement the Record is Denied, as this Court Cannot**

**Consider Medical Evidence that was Not Before the Commissioner**

The Court may not review materials that were not before the Commissioner. This much is made clear by 42 U.S.C. § 405(g), which explains that the Commissioner's answer should include the evidence "upon which the findings and decision complained of are based. The court shall have the power to enter, *upon the pleadings and transcript of record*, a judgment. . ." [emphasis added]. Further, the Tenth Circuit Court of Appeals has made this explicit. "Court review of the Secretary's denial of Social Security disability benefits is limited to a consideration of the pleadings and the transcript filed by the Secretary as required by 42 U.S.C. § 405(g). It is not a trial de novo. The court is not at liberty to consider evidence not in the record certified by the Secretary." *Atteberry v. Finch*, 424 F.2d 36, 39 (10th Cir. 1970).

This principle is at issue here because pursuant to this Court's Order Granting Leave to Supplement Memoranda, the petitioner motioned the Court to supplement the record with new evidence in the form of medical records from one of Dedic's physicians, Tuenis Zondag, M.D. The records cover the period from November 22, 2005 through January 16, 2006, which is the period spanning the time that elapsed between the ALJ's hearing on November 18, 2005, and his Decision, which was issued on January 20, 2006.

It is true that there are limited circumstances under which a court can remand a case to the Commissioner to review new evidence. Such a remand to consider additional evidence

is proper "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Tenth Circuit Court of Appeals has spoken to this issue, and has explained that, "[t]he court may . . . at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . Remand is appropriate only if a court determines that the new evidence would have changed the Commissioner's decision had it been before her." *See Cagle v. Califano*, 638 F.2d 219, 221 (10th Cir. 1981).

The Court need not reach the question of whether the new evidence would have changed the Commissioner's decision, because it finds that the petitioner has not shown good cause for the failure to incorporate the evidence into the record while it was still before the Commissioner. Dedic has submitted an affidavit which states that after she received the ALJ's decision denying her claim, she called her local Social Security office and asked a woman there whether she should obtain and submit additional medical evidence to the Administration. The information she sought to submit was the medical records from Dr. Zondag, whom she had continued to see after her hearing. Dedic states that the woman to whom she spoke advised her not to submit any additional medical evidence unless she filed a new application for disability benefits. In addition, after the hearing but before she received the ALJ's denial, she was examined by Dr. Zondag, who completed a functional capacity assessment form. She spoke to a woman at the Office of Hearings and Appeals in Rapid City

and was advised that she should send the assessment form in, but that it probably would not be made part of the record because it was being submitted after the hearing.

The Court finds that this does not amount to good cause. Dedic knew that she could (and she did) send additional information to the ALJ after the hearing, regardless of the information that Dedic received from the woman at the OHA office. Further, the erroneous information that Dedic received from the woman at the SSA office, while unfortunate, was directly contrary to printed information that she received from the ALJ himself, which told her that she could submit new evidence to the Appeals Council. The ALJ's Notice of Decision explicitly instructed the petitioner on how to file an appeal, the time she had to file an appeal, time to submit new evidence, and how an appeal works. The information is clearly set forth. The second sentence states, "Please read this notice and the decision carefully." The second page of the notice starts with the bold words: "Time to Submit New Evidence." That section contains only this sentence: "You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review." Tr. 9-10 (emphasis in original). That Dedic was not represented by counsel at the time is of little moment here where she was explicitly instructed that she was allowed to submit new evidence to the Appeals Council. The Court therefore finds that a remand to the Commissioner to consider the new evidence is not appropriate here, and instead that this Court must proceed with its review of the Commissioner's decision.

13

## Standard of Review

The role of this Court in reviewing the decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by "substantial evidence" and whether the decision contains a sufficient basis to determine that the ALJ has applied the correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996). "Substantial evidence" is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

The Court may neither re-weigh the evidence nor substitute its judgment for that of the Agency. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Furthermore, this Court's inquiry is limited to the administrative record. *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002). Even if the Court could have reached, or would have reached a different conclusion, the ALJ's decision will stand if supported by substantial evidence. *Id.*

## Legal Framework

In evaluating a claim for Disability Insurance Benefits, the Commissioner must consider sequentially whether the claimant: (1) was engaged in substantial gainful activity during the period of disability; (2) had a medically severe impairment or combination of impairments; (3) had a condition which met or equaled the severity of an impairment listed as precluding substantial gainful activity; (4) was able to return to the work he had performed

in the past; and (5) could perform other work in the national economy in view of the claimant's age, education, and work experience. *See, e.g.*, 20 C.F.R. § 404.1520.

The Commissioner must follow the aforementioned five-step sequential evaluation process to determine whether a claimant is disabled. *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four. *Id.* If she successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant "retains sufficient RFC to perform work in the national economy, given her age, education, and work experience." *Id.* The Tenth Circuit has clarified this five-step process as follows:

> Step one determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. If he is not, the decision maker must proceed to step two: determining "whether the claimant has a medically severe impairment or combination of impairments." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). This determination is governed by the Secretary's severity regulations, 20 C.F.R. §§ 404.1520(c), 416.920(c) (1986), is based on medical factors alone, and, consequently, does not include consideration of such vocational factors as age, education, and work experience. Pursuant to the severity regulations, the claimant must make a threshold showing that his medically determinable impairment or combination of impairments significantly limits his ability to do basic work activities, i.e., "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b) (1986); *accord Bowen v. Yuckert*, 482 U.S. at 140. Presumptively, if the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, irrespective of vocational factors, the impairments do not prevent the claimant from engaging in substantial gainful activity. *Bowen v. Yuckert*, 482 U.S. 145. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, on the other hand, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step

15

three.

. . . .

Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. §§ 404.1520(d), 416.920(d) (1986). *Bowen v. Yuckert*, 482 U.S. 140. If the impairment is listed and thus conclusively presumed to be disabling, the claimant is entitled to benefits. If not, the evaluation proceeds to the fourth step, 20 C.F.R. §§ 404.1520(e), 416.920(e) (1986), where the claimant must show that the "impairment prevents [him] from performing work he has performed in the past." *Bowen v. Yuckert*, 482 U.S. 140; *see Tillery v. Schweiker*, 713 F.2d 601, 602 (10th Cir. 1983). If the claimant is able to perform his previous work, he is not disabled.

The Appeals Council determined that Mr. Williams' impairments are not found on or medically equal to the Secretary's list of impairments conclusively presumed to be disabling. The Appeals Council found, however, that Mr. Williams is unable to return to his past relevant work as a diesel mechanic. At this point, then, Mr. Williams has met his burden of proof, establishing a prima facie case of disability. The evaluation process thus proceeds to the fifth and final step: determining whether the claimant has the residual functional capacity (RFC) "to perform other work in the national economy in view of his age, education, and work experience." *Bowen v. Yuckert*, 482 U.S. 140. The burden of proof is now shifted to the Secretary. *Bowen v. Yuckert*, 482 U.S. 140, 146 n. 5. Thus, the claimant is entitled to benefits if the Secretary cannot establish that the claimant retains the capacity "to perform an alternative work activity and that this specific type of job exists in the national economy." *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir.1984); 20 C.F.R. §§ 404.1520(f), 416.920(f) (1986); *see Campbell v. Bowen*, 822 F.2d, 1518, 1522 (10th Cir. 1987); *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir.1987).

To meet this burden, the Secretary may rely on the Medical-Vocational Guidelines (grids), 20 C.F.R., pt. 404, Subpt. P, App. 2 (1986). The grids consider a claimant's RFC in relation to his age, education, and work experience. *Channel v. Heckler*, 747 F.2d at 578. A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC

category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). No doubt, a claimant may have significant exertional limitations that prevent him from performing the strength requirements of even sedentary work.

Once a claimant is placed in a particular RFC category, the decision maker turns to the grids which direct a conclusion as to whether the claimant is or is not disabled, depending on the claimant's characteristics, i.c., his RFC category and vocational factors. If a conclusion of "not disabled" rcsults, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, since nonexertional limitations are not factored into the grids but must be taken into account in determining a claimant's RFC, the grids cannot be applied conclusively if a claimant has nonexertional limitations that significantly limit his "ability to perform the full range of work in a particular RFC" category on a sustained basis. *Teter v. Heckler,* 775 F.2d 1104, 1105 (10ᵗʰ Cir.1985); *Channel v. Heckler,* 747 F.2d at 579; *accord Da Rosa v. Secretary of Health and Human Services,* 803 F.2d 24, 26 (1ˢᵗ Cir.1986) ("If a claimant has a nonexertional limitation in addition to his exertional limitations, then the ALJ may not mechanically apply the rules contained in the Grid."). Thus, when a claimant suffers from both exertional and nonexertional limitations, and the exertional limitations in and of themselves do not establish disability, the grids provide no more than a framework for determining disability. As a starting point, the grids are first applied to reflect the maximum residual strength or exertional capabilities of the claimant. The decision maker must then consider all relevant facts to determine whether the claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations. *Frey v. Bowen,* 816 F.2d at 513. In other words, if a significant number of jobs presumed by the grids to exist for a claimant cannot be performed on a continuing and regular basis because of the claimant's nonexertional limitations, thc claimant may bc disabled even though he may bc cxcrtionally capable of meeting the strength requirements of those jobs.

*Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir. 1988) (footnotes omitted).

## Analysis

**1.    Did the ALJ Err by Failing to Properly Assess Whether Plaintiff Meets or Equals a Listed Impairment?**

This argument centers around the ALJ's finding that Dedic does not meet or equal the impairment listed at 1.04(B)[2] in Appendix 1 to Subpart P to Part 404. This was the third step in the ALJ's analysis, and is significant because if a claimant's condition is found to meet one of the listed impairments, the claimant is considered to be disabled. Specifically, the ALJ found that Dedic's lumbar fusion, and back, hip and leg pain are considered severe impairments.  He then found that the impairments do not meet or equal any of the listed impairments, including the impairment listed at 1.04(B). (Tr. 20). Listing 1.04 requires a disorder of the spine which results in compromise of a nerve root or the spinal cord. Subsection B, which plaintiff alleges that she meets, then requires a showing of confirmed

---

[2] The provision states the following:

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
With:

A.. . . . .
*or*
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
*or*
C.

spinal arachnoiditis, manifested by burning or painful dysesthesia, resulting in the need for

changes in position or posture more than once every two hours.

The ALJ found that there is no evidence to satisfy Listing 1.04. He explained the

grounds for his finding:

> The claimant has a history of lumbar fusion and has back, hip and leg pain. . . .The Administrative Record lacks evidence of degenerative disk disease resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motor of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, when involving the lower back, positive straight-leg raising test (sitting and supine), or spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on medically acceptable imaging, manifested by chronic nonradicular  pain and weakness, resulting in an inability to ambulate effectively.

> The undersigned concludes, based upon a review of the medical records, that the claimant's impairments either individually or collectively do not meet or equal a Medical Listing. Consistent with *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996), the undersigned makes this specific finding on the following basis. First, State Agency physicians and examiners concluded that the claimant's impairments did not meet or equal a Medical Listing. *See* Social Security Ruling 96-6p. Second, no consultative examiner has concluded that a Medical Listing is met or equaled. Third, no treating or examining physician has suggested that a Medical Listing was met or equaled. Finally, based upon the undersigned's independent review, no Medical Listing is met or equaled.

(Tr. 15).

Dedic submits two arguments in support of her contention that the ALJ failed to

properly assess whether she met or equaled a listed impairment. First, she claims that she

meets the requirements of 1.04(B) because she has arachnoiditis confirmed by an appropriate

imaging technique, severe burning or painful dysesthesia, and a resulting need to change

posture or position more often than every two hours. She cites to the myelogram taken in May of 2005 which establishes the presence of arachnoiditis. In the course of making his finding that Dedic did not meet a listed impairment, the ALJ did not mention the 2005 myelogram that showed arachnoiditis, although he did mention it elsewhere in the opinion. It is unclear if he did not consider it at this stage, or if he considered it and found it to be insufficient to meet the listing. She also cites to several places in the record wherein she had alleged burning pain. The burning pain she complained of was always in her legs. In addition, she cites to the findings of two physicians (Studer and Zondag), who in their assessments found that she had to change position from sitting to standing (and vice-versa) every 30 minutes. The ALJ later gave "very little weight" to the findings of Zondag, and rejected that portion of Studer's opinion regarding Dedic's ability to sit, stand and walk. It is not clear if the ALJ's rejection of Studer's opinion also included a rejection of Studer's opinion regarding the frequency of Dedic's need to change positions, although that opinion is related to the afore-mentioned, and it may be safe to assume that the ALJ rejected that portion of Studer's opinion as well.

Dedic also contends that her combined spinal impairments equal Listing 1.04 because disorders of both the cervical and lumbar spine, when considered in combination as required by 20 C.F.R. § 404.1523, equal the severity required by the listing. The cervical spine disorder to which Dedic refers is a disc herniation with cord compression at C6-C7, which is demonstrated by the 2005 myelogram. Section 404.1523 states that in determining whether

20

the impairment is sufficient, "we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." Again, the ALJ did not mention the 2005 myelogram in his discussion of the listing, but he clearly states that he did consider the combination of impairments, and he explicitly set forth the basis on which he made his findings.

The government argues that the ALJ's finding is well-supported, and that "for a claimant to show that his impairments match a Listing, they must meet *all* the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify." The government argues that 1.04(B) requires that the spinal arachnoiditis must result in compromise of the nerve root or spinal cord, and that the "mild arachnoiditis" that Dedic suffers from is insufficient. The government explained that the ALJ specifically relied on the opinions of Dr. Kline and Dr. Kanard to reach his conclusion that Dedic's impairments did not meet or equal a listed impairment, but it should be noted that those opinions were issued in 2004 and that the myelogram that evidences the existence of arachnoiditis was not taken until May 23, 2005. The government also argued that the neurologist read the 2005 myelogram and reported that it "looks okay." (Tr. 223). After questioning whether the fusion at the lower level was completely healed the neurologist, Dr. Narotzky, ordered more x-rays, and upon reviewing those he reported that the "x-rays look

okay and the fusion looks solid." Tr. 225. At no point did Dr. Narotzky mention the arachnoiditis, the disc herniation, or the cord compression. The government further argues that 1.04(B) requires that either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture be the cause of the spinal cord or nerve root compromise. Here, however, the myelogram showed that marked facet hypertrophy, which is not listed in 1.04, caused the compression. The government's argument is that based on the independent medical records and based on Dr. Narotzky's review of the myelograms, there is substantial evidence to support the ALJ's conclusion that Dedic did not meet a listed impairment.

It is troubling that the ALJ did not mention the 2005 myelogram in this part of his findings, although he clearly was aware of it, as he mentioned it elsewhere. "In addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Regardless, there is substantial evidence to support the ALJ's decision that Dedic did not meet a listed impairment, especially in light of two physician reports that did not evidence much limitation in Dedic's abilities, and in light of the notes of Dr. Narotzky, a treating physician, that stated that the myelogram "looks okay." Further, the myelogram stated only that "there is mild clumping of nerve roots suggesting mild arachnoiditis." This would not seem, as the government points out, to be evidence of arachnoiditis *resulting in the compromise of a nerve*

22

*root or the spinal cord*, which is required to meet Listing 1.04. Further, the burden of establishing disability under the Listings is on the claimant. *See Hendrix v. Barnhart*, 313 F.Supp.2d 1222, 1230 (D. Utah 2004) (finding no error where ALJ, among other things, acknowledged medical evidence of multiple impairments, acknowledged the multiple severe impairments in the RFC determination, thoroughly discussed the impairments within his decision, and clearly stated the impairments were considered in combination. The Court also found that the claimant "failed to adequately specify how her condition or conditions met or equaled any listed impairment," and where she offered no evidence that any physician supported her position.") As the ALJ noted, no treating or examining physician has suggested that a Medical Listing was met or equaled. The Court concludes that there is substantial evidence supporting the ALJ's conclusion that Dedic's condition does not meet one of the listed impairments.

### 2.    Did the Commissioner err in assessing a residual functioning capacity, most particularly by rejecting opinions of treating physicians?

A claimant's residual functional capacity is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 1545(a)(1). The Commissioner assesses a claimant's residual functional capacity "based on all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). Dedic claims that the ALJ erroneously rejected the conclusions of two treating physicians, Dr. Studer and Dr. Zondag, when he assessed Dedic as retaining the functional capacity to perform light work. Citing 20 C.F.R. § 404.1527, Dedic avers that the opinions of treating physicians are entitled to substantial, and under certain circumstances,

controlling weight. *Plaintiffs Memorandum in Support of Claim for Relief* at 16. Dedic
argues that even if the ALJ does not give the opinion controlling weight, the opinion must
still be weighed using all of the factors set forth in 20 C.F.R. § 404.1527.

The government argues that the conclusions of the physicians were rejected because
they were contrary to the medical evidence, not sufficiently supported by specific findings,
and contrary to Dedic's own testimony regarding her abilities. In addition, the government
argues that Dr. Zondag should not be considered to be a treating physician. Above all, the
government argues, Dedic is impermissibly asking this Court to reweigh the evidence to find
that both opinions are entitled to controlling weight, and that, "it is the ALJ, as administrative
fact-finder, who is charged with weighing the evidence, and a court reviewing an ALJ's
decision may neither reweigh the evidence nor substitute its judgment for that of the ALJ."

According to the definition found at 20 C.F.R. § 1502, a "treating source" refers to
"your own physician . . . who provides you, or has provided you, with medical treatment or
evaluation and who has, or has had, an ongoing treatment relationship with you. A
"nontreating source," is a physician "who has examined you but does not have, or did not
have, an ongoing treatment relationship with you." *Id.* The regulations specifically explain
that "[w]e will not consider an acceptable medical source to be your treating source if your
relationship with the source is not based on your medical need for treatment or evaluation,
but solely on your need to obtain a report in support of your claim for disability." *Id.* An ALJ
is not required to give a non-treating physician's opinion controlling weight, nor is the ALJ

24

required to give specific reasons for not giving it controlling weight. *See Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003). However, regardless of its source, the Commissioner must evaluate every medical opinion it receives. *See* 20 C.F.R. § 404.1527(d).

Unless an opinion is given controlling weight, the Commissioner considers several factors in determining the weight to give to the opinion. 20 C.F.R. § 404.1527(d). Those factors include whether there is an examining relationship, whether there is a treatment relationship, supportability of the opinion, consistency, specialization, and other factors. The consistency factor is important to the present case. That provision states that, "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(d)(4). Also pertinent here is the provision regarding supportability, which states that "the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanation for their opinions." 20 C.F.R. § 404.1527(d)(3).

The ALJ determined that Dr. Studer's opinions were not entitled to controlling weight. Dr. Studer had given an opinion regarding Dedic's limitations, including her ability to stand, sit, and walk during an eight-hour workday. (Tr. 238-243). The ALJ found that the portion

of Studer's opinion wherein he determined that Dedic could only sit, stand, and walk for a total of six hours out of an eight-hour workday was not supported by the medical records.

The Court agrees with the government's contention that substantial evidence supports the ALJ's conclusion that Dr. Studer's opinion regarding Dedic's limitation was unsupported by the medical records. In reviewing Dedic's medical records, the ALJ explained in his decision that:

> An examination of October 2004 revealed a normal gait, normal motor strength in the lower extremities, and sitting straight leg raise was negative to 90 degrees bilaterally. Diagnostics of May 2005 demonstrated a 'stable lumbosacral fusion, no instability or hardware failure identified,' and a myelogram 'looked okay.' X-rays in June 2005 'looks okay and the fusion looks solid,' and exam again revealed sitting straight leg raise was negative to 90 degrees bilaterally. X-rays of July 2005 revealed the claimant's pelvis looks okay.

The government, citing to specific portions of the record, also points out that "several examinations found normal gait, strength, reflexes, straight leg raising tests, and sensation." The Court finds that the ALJ properly determined that Dr. Studer's finding of limitation was unsupported by the medical records.

Further, the ALJ found that Dr. Studer's opinion is contrary to Dedic's self-described abilities and daily activities, which include housework and taking care of her children. An ALJ may reject a treating physician's opinion if that opinion is inconsistent with the claimant's claimed daily activities. *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). The government argues that Dr. Studer's opinion is inconsistent with Dedic's written statement regarding her daily activities (Tr. 111-13), the written

26

statement of Diana Tuschling regarding plaintiff's activities (Tr. 116-24), and the written statement of Dedic's husband, which all failed to describe a need for extended periods of lying down. (Tr. 127-35). While Dedic's husband did acknowledge that Dedic has some limitations with regard to her daily activities, including that she needs help moving full laundry baskets, carrying groceries, and that she is limited with regard to her ability to bend or lift, the Court finds that the ALJ did not err in determining that Dr. Studer's opinion is inconsistent with the described daily activities, all descriptions of which portray a fairly active lifestyle that is clearly inconsistent with Dr. Studer's opinion that Dedic cannot sit, stand, and walk more than six hours per day.

The government also argues that Dr. Studer did not provide any medical findings to support his assessment. The form asks the physicians to "Identify the particular medical or clinical findings (i.e., physical exam findings, x-ray findings, laboratory test results, history, symptoms (including pain etc.) which support your assessment or any limitations." The report asks, specifically, after each assessment, for the physician to "please identify the medical findings that support this assessment (unless a narrative report is attached)." Dr. Studer did, however, attach progress notes from two separate office visits to his Assessment. The content of these notes was not specifically related to Dr. Studer's assessment.

The ALJ gave "very little weight" to the opinions of Dr. Zondag, who also opined that Dedic had limited ability to sit, stand, and walk during an eight-hour workday. The ALJ received Dr. Zondag's report after the hearing. In Dr. Zondag's opinion, Dedic could sit for

27

less than one hour and for two hours total in an eight-hour workday, could stand for less than one hour at one time and for one hour total in an eight-hour workday, and could walk for less than one hour at one time and for one hour total in an eight-hour workday. The ALJ found that Dr. Zondag's opinion was unsupported by the medical records, and was inconsistent with Dedic's testimony regarding her daily activities. Further, the ALJ found no treating or examining relationship between Dr. Zondag and Dedic.

While Dedic avers that the opinions of treating physicians are entitled to substantial[3], and sometimes controlling weight, the Court finds that based on the record before the ALJ, Dr. Zondag was not a treating physician. The Court agrees that the record does not contain any evidence of a treating or examination relationship between Dedic and Dr. Zondag, aside from the medical assessment completed by Dr. Zondag in November 2005, and aside from a note referencing Dedic's request for a referral to Dr. Zondag. (Tr. 225). In accordance with the definition of "treating source," provided above, the Court finds that Dr. Zondag does not fit the definition of treating source. His opinion is therefore not entitled to controlling weight.[4]

---

[3] 20 C.F.R. § 404.1527(d)(2) states: "Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

[4] The Court also rejects the petitioner's argument that because Dedic was unrepresented at the hearing, the ALJ had a heightened duty to develop the record, and that "if the ALJ doubted Plaintiff's treatment relationship with Dr. Zondag, he was

28

The ALJ noted that there was no indication that Dr. Zondag reviewed the medical records, but the Court finds that Dr. Zondag's report does reference specific information regarding Dedic's medical condition, and that all of the references in Dr. Zondag's assessment were derived from Dedic's 2005 myelogram.

The ALJ also gave little weight to Zondag's opinion because it was inconsistent with Dedic's testimony. While the record does contain medical reports where Dedic complained about the pain she experiences while sitting, standing or walking, the record also contains extensive testimony from Dedic herself regarding her daily activities, which the government characterizes (fairly) as "an active, if somewhat limited, lifestyle." The Court therefore finds that the ALJ did not err in using the inconsistency as a basis on which to limit his reliance on Zondag's opinion.

In sum, the Court finds that the ALJ did not err by rejecting portions of the opinions of Dr. Studer and Dr. Zondag.

## 3.   Did the ALJ err in finding that Dedic's allegations were less than credible?

The ALJ specifically found that Dedic's allegations regarding her limitations were not completely credible. In *Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005), the Tenth Circuit explained the permissible analysis of an ALJ's credibility findings:

obligated to make further inquiry." The Court finds that the ALJ had no such duty here where Dr. Zondag's report was not even received by the ALJ until after the hearing.

29

'Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.' *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990). However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.' *Huston [v. Bowen]*, 838 F.2d [1125,] 1133 [ (10th Cir.1988)] (footnote omitted); *see also Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir.1992) (ALJ 'must articulate specific reasons for questioning the claimant's credibility' where subjective pain testimony is critical).

In *White v. Barnhart*, the Tenth Circuit outlined the ALJ's role in assessing claimant credibility concerning allegations of pain and disability:

In *Kepler v. Chater*, this court offered factors an ALJ should consider in evaluating subjective allegations of pain, an evaluation that ultimately and necessarily turns on credibility. 68 F.3d 387 (10th Cir. 1995). While we have insisted on objectively reasonable explanation over mere intuition, we have not reduced credibility evaluations to formulaic expressions: "*Kepler* does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000).

287 F.3d 903, 909 (10th Cir. 2001). The *White* court continued in a footnote:

Those factors are: 1) whether the objective medical evidence establishes a pain-producing impairment; 2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and 3) if so, whether considering all the evidence, claimant's pain is in fact disabling. *Kepler*, 68 F.3d at 390.

In *Huston v. Bowen*, 838 F.2d at 1132, the Tenth Circuit suggested what an ALJ should consider in determining credibility:

The ALJ can weigh and evaluate numerous factors in determining the credibility of pain testimony for the years in question. Some of the possible

30

factors include: the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence. (internal citations omitted).

The ALJ noted that despite Dedic's allegations regarding her constant high level of pain, that she had not sought any emergency medical treatment, that her records indicate only minor changes in the portion of her back where she received her surgery, that it had been opined that those minor changes did not adequately explain her level of pain, and that Dedic's self-described daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The ALJ acknowledged that Dedic may experience pain and discomfort, but that the law requires more than the mere inability to work without pain.

Specifically, the ALJ wrote:

Although the claimant alleges a constant pain level of '8 out of 10,' she has not sought any emergency medical treatment such as emergency room visits for shots of Demerol or similar such narcotic pain treatment, and the record also reveals the claimant only has minor changes at the level above her back fusion which has been opined does not adequately explain the claimant's level of pain (Ex. 6F/6), and no diagnostics have revealed any significant findings for such as well. While the undersigned recognizes that the claimant may experience pain and discomfort, the law is clear that 'disability' requires more than the mere inability to work without pain. *Ray v. Bowen*, 865 F.2d 222, 225-26 (10th Cir. 1989). Further, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant testified her husband works full time, Monday through Friday, from 6:00 a.m. to 9:00 p.m., and because of travel he is not at home 1 to 2 nights each week. Thus, the claimant is able to care for

31

the home, and care for four children at home, one of which is two-years-old
which can be quite demanding both physically and emotionally, without any
particular assistance, and in fact collateral information describes such as 'she
does pretty much what I do as a mother, except she has 2 little ones–runs all
day (not really running) (busy).' (Ex. 6E/1). Although the claimant alleges
such severe pain at no time in her description of a typical day does she state a
need to rest or lie down due to pain.

Dedic argues that the bases identified by the ALJ for discrediting Dedic are refuted

by the evidence in the record. Dedic also offered justifications in response to the ALJ's

skepticism regarding her credibility. She notes that the various prescriptions prescribed to her

were either intolerable or ineffective, and that the fact that she has only received infrequent

treatment is justified by her financial status, which prevented her from receiving and

continuing some treatment. She further explained that the 2005 myelogram evidenced

significant spinal abnormalities, and that the ALJ relied upon outdated information to make

his determination that she had only minor changes above her back fusion. Dedic also argues

that despite the ALJ's findings that her activities were not as limited as expected due to her

reported level of pain, her daily activities were, in fact, "substantially reduced, and that the

ALJ ignored evidence submitted by third parties (Dedic's husband and a friend), that Dedic

needed help completing some of her chores. Further, Dedic argues, minimal daily activities

cannot discredit a claimant.

The ALJ's Decision explained the grounds for his finding that "the claimant's

allegations regarding her limitations are not totally credible," and the Court finds that the

ALJ did not err in this determination. The ALJ found that "no diagnostics have revealed any

significant findings" for her level of pain. (Tr. 19). Based on the record, the Court agrees.

Plaintiff makes much of the 2005 myelogram, but this Court finds it significant that her own

neurologist, a treating physician, made very little of the same myelogram. He did not so much

as mention arachnoiditis. After reading the myelogram, Dr. Narotzky reported that it "looks

okay." (Tr. 223). After ordering additional x-rays, he reported that "plain x-rays look okay

and the fusion looks solid." (Tr. 225). In addition, her pelvic x-ray "looks okay." (Tr. 227).

Further, he noted that "her previous myelogram and x-rays have not shown any specific

correctable cause for her ongoing pain." (Tr. 226).

The ALJ also found that "the claimant has described daily activities which are not

limited to the extent one would expect, given the complaints of disabling symptoms and

limitations." (Tr. 19). Again, the Court agrees, and concludes that the ALJ's findings in this

regard are supported by the evidence in the record. A review of the hearing transcript reveals

Dedic's active lifestyle.[5] The Court also notes that Dedic lives in a two-

---

[5] In describing her typical day, Dedic explained that she wakes up between 6:00
and 6:30 a.m. She gets her children ready, feeds them breakfast, sometimes prepares their
lunch, and drives them to school. This sometimes requires two separate trips, one for her
child that attends junior high, and one for her five-year-old that attends elementary
school. The drive is approximately four miles. When she gets home, if she has enough
energy she goes upstairs to take a shower. Depending on how she is feeling she makes
phone calls or pays her bills, and sits down to have lunch with her two-year-old. In the
afternoon she tries to get laundry done, and the laundry is located on the main level of the
home. The afternoon also involves other housework, including dusting, vacuuming, (if
she feels up to it) and running errands and transporting her mother around town when the
need arises. She then picks her children up at school. When she arrives home she prepares
dinner, helps the children with their homework, and gets the kids ready for bed. On
weekends she attends events for her children. She takes care of her garden, goes out to

story house, with the bedrooms and two of the bathrooms upstairs. She lives with and cares for her husband, mother, four children, one of whom was two years old at the time of the hearing, and two dogs. This self-described (and corroborated) activity level is indeed inconsistent with Dedic's alleged limitations.

Dedic argues that the ALJ did not mention the evidence contributed by both her husband and a friend that Dedic required help with some of her chores. Dedic also points to places in the record that belie the ALJ's assertion that "although the claimant alleges such severe pain at no time in her description of a typical day does she state a need to rest or lie down due to pain." While there are several places in the record where Dedic mentioned fatigue and a need to rest, it is true that in her description of her day during hearing she at no time mentioned a need to lie down or rest, despite being asked to describe an "average" day. The ALJ's failure to mention her need to rest does not undermine the basis for his credibility determination.

Further, while plaintiff argues that "minimal daily activities do not discredit an individual," the Court finds that the activities described by Dedic far exceed "minimal daily activities." Dedic describes, in several places in the record, including in her testimony, an average day of sustained activity that she does day in and day out, which includes, notably, taking care of a two-year-old and three other children, doing chores in a two-story house, and

---

eat, and visits with friends. Up until about six months prior to the hearing, she was going to the gym work for ten to twenty minutes on the treadmill or the elliptical machine.

doing all of this by herself while her husband works long hours and is traveling away from home one to two nights per week.

The Court agrees with Dedic that the record reveals that she has tried several medications, some of which were ineffective or intolerable. The record also shows that on several occasions Dedic turned down medical treatment or tests because of the cost. Further, 20 C.F.R. § 404.1529 explains that, "[t]he information that you, your treating or examining physician or psychologist or other persons provide about your pain or other symptoms (E.G., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms." Pursuant to this provision, Dedic points to portions of the record that indicate that aggravating factors include sitting, standing, walking, coughing and sneezing, and movement. Dedic also notes that in addition to her medications, she has participated in physical therapy, had epidural injections and Prolo therapy, and used heat and massage and lying down.

While all of these factors lend themselves to Dedic's credibility, it is not this Court's job to reweigh the evidence. Rather this Court's role is limited to determining whether substantial evidence supports the ALJ's conclusions regarding Dedic's credibility. The Court finds that it does.

35

## Conclusion

The Court finds that the ALJ did not err in finding that Dedic's condition did not meet a listed impairment, did not err in rejecting portions of the opinion of Dr. Studer and in giving little weight to Dr. Zondag's opinion, and did not err in finding that Dedic's allegations regarding her limitations were not totally credible. It is not this Court's place to reweigh the evidence, and having found no legal error and having found that substantial evidence supports the ALJ's determinations, the Court affirms the Commissioner's decision.

Accordingly, and for the foregoing reasons, it is hereby

**ORDERED** that the plaintiff's Motion to Supplement the Record shall be, and now is, **DENIED**. It is further **ORDERED** that the Commissioner's decision shall be, and now is, **AFFIRMED**.

Signed this _____ day of August, 2007.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE